IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, § § § Plaintiff, § § v. § BOBRICH ENTERPRISES d/b/a § SUBWAY, § § Defendant. § | No. 3:05-CV-1928-M |

## ORDER

Before the Court is Defendant's Renewed Motion for Judgment as a Matter of Law, and Plaintiff's Motion to Withdraw EEOC's Application for Injunctive Relief. Prior to the commencement of a hearing on October 19, 2007, the parties reached an agreement on the matters as to which Plaintiff sought injunctive relief. Therefore, Plaintiff's Motion to Withdraw EEOC's Application for Injunctive Relief is **GRANTED**.

After consideration of the parties' written briefs, as well as the arguments made during the hearing, the Court **GRANTS** Defendant's Motion for Judgment as a Matter of Law as to Plaintiff's constructive discharge claim but **DENIES** it as to Plaintiff's claims that she was disabled as a matter of law and subject to a hostile work environment.

*The Legal Standard*

A motion for judgment as a matter of law is reviewed to determine whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[1] It should only be granted "where the facts and inferences indicate a particular outcome so

---
[1] FED. R. CIV. P. 50(a)(1).

strenuously that reasonable minds could not disagree."[2] Where evidence is susceptible to more than one interpretation, a court is "not free to reweigh the evidence or to re-evaluate the credibility of witnesses."[3] Unless there is no legally sufficient evidentiary basis for a reasonable jury to find as it did, the jury verdict must be upheld.

*Whether Tammy Gitsham was disabled as a matter of law*

The evidence presented at trial was sufficient for a reasonable jury to find that Ms. Gitsham was substantially limited in the major life activity of hearing. The Americans with Disabilities Act (ADA) defines disability as: "a physical or mental impairment that substantially limits one or more of the major life activities of the individual."[4] EEOC regulations include hearing as an enumerated major life activity.[5] An individual has "substantially limited" hearing when the condition, manner, or duration of her impairment is severe, compared to how an unimpaired individual would use the faculty in daily life.[6] The following factors are relevant: (i) the nature and severity of the impairment; (ii) its duration or anticipated duration; and (iii) its long-term impact.[7]

The evidence introduced at trial confirms the severity and long-term impact of Ms. Gitsham's hearing disability, which significantly restricted her ability to communicate with others in person and over the telephone. Audiology and medical documents introduced by the

---

[2] *Aguillard v. McGowen,* 207 F.3d 226, 228-29 (5th Cir. 2000).
[3] *Hiltgen v. Sumrall,* 47 F.3d 695, 699 (5th Cir. 1995).
[4] 42 U.S.C. §12102(a).
[5] 29 C.F.R. §1630.2(i); *see also Cutrera v. Board of Sup'rs of Louisiana State University*, 429 F.3d 108 (5th Cir. 2005); *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1088 (8th Cir. 2001).
[6] *Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184, 201-201 (2002); 29 C.F.R. §1640.2(j)(1)(i)-(ii).
[7] *Id.* § 1630.2(j)(2)(i)-(ii).

EEOC demonstrated moderate to severe sensorineural loss in Ms. Gitsham's left ear and severe to profound sensorineural hearing loss in her right ear.[8] Ms. Gitsham hears sounds beginning in the 45 dcB and 75 dcB range in her left and right ears, respectively. Travis Ortega, the owner of Advanced Hearing and Audiology Associates, who conducted the audiology examination on Ms. Gitsham, testified that the normal range for hearing is approximately 0-25 dcB.

The evidence presented at trial demonstrated that Ms. Gitsham not only has difficulty detecting sounds in the lower decibel range but also struggles with word differentiation, even when conversing in a quiet setting. The audiology exam conducted by Mr. Ortega revealed that Ms. Gitsham could only discriminate 56% of the words spoken to her while she was in a soundproof booth without any background noise. Mr. Ortega testified that Ms. Gitsham would encounter even greater difficulties communicating in a noisy setting. Mr. Ortega's observations corroborate Ms. Gitsham's testimony about her personal experience. Ms. Gitsham testified that, even with the assistance of hearing aids, she cannot engage in conversation unless the speaker is directly in front of her, cannot hear speech over the telephone, regularly misses words during conversations, and is unable to hear her doorbell or telephone ring. This testimony is consistent with that of Gail Massey, a former Subway manager and friend of Ms. Gitsham, who observed that Ms. Gitsham can only engage in conversation when the speaker is looking directly at her, enabling her to read the speaker's lips.

The anticipated duration of Ms. Gitsham's impairment reinforces the conclusion that she has substantially limited hearing.[9] There is no cure to halt or reverse the effects of her hearing impairment. This summary demonstrates that the EEOC presented evidence sufficient for a

---

[8] Pl. Ex. 22, audiological exam of Tammy Ms. Gitsham.
[9] 29 C.F.R § 1630.2(j)(2).

reasonable juror to conclude that Ms. Gitsham, even with the assistance of hearing aids, is substantially limited in the major life activity of hearing.

Bobrich responds that Ms. Gitsham was not disabled because hearing aids enabled her to function normally in the workplace. In so contending, the Defendant relies on the Supreme Court's pronouncement that "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."[10] Bobrich argues only that Ms. Gitsham's corrective measures allowed her to perform her job normally, not that corrective measures allowed her to hear normally. Even if she is not substantially limited in the major life activity of *working*, evidence introduced by the EEOC demonstrated that she was substantially limited in the major life activity of *hearing*, even with the use of hearing aids. Because legally sufficient evidence supports the finding that Ms. Gitsham was disabled as a matter of law, the Court does not reach the issue of whether the Defendant "regarded" her as disabled.[11]

*Whether Bobrich subjected Tammy Gitsham to a hostile work environment*

The next issue is whether the EEOC presented sufficient evidence for a jury to conclude that Ms. Gitsham was subjected to a hostile work environment. To prevail on a hostile work environment claim, the plaintiff must demonstrate: (1) that she belongs to a protected group;[12] (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her

---

[10] *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482–83 (1999).
[11] Any of the following conditions qualify as a "disability":
(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2).
[12] Defendant's Motion does not challenge the jury's finding that Ms. Gitsham belonged to a protected group and, accordingly, the Court does not address it here.

disability; and (4) that the harassment affected a term, condition, or privilege of employment.[13] In evaluating the effect of the harassment on plaintiff's employment, the following factors are relevant: the frequency and severity of the conduct, whether it is physically threatening or humiliating or a merely insensitive utterance, and whether it unreasonably interferes with the employee's job performance.[14] An employer's conduct and comments are viewed collectively rather than in isolation to determine their effect on the plaintiff's employment conditions.[15]

The severity of the comments or conduct is an important factor informing whether a hostile work environment existed.[16] Public denigration of a victim's disability is more likely to be considered severe conduct.[17] Further, persistent "ridicule[ ] and insults" may also be egregious conduct altering the conditions of a victim's employment.[18]

Here, there was sufficient evidence to conclude that the Bobrich supervisors' frequent ridiculing of Ms. Gitsham's impairment was severe conduct, creating a hostile work environment. A reasonable jury could have found violative of the ADA statements such as, "Tammy, got your ears on?" and "Read my lips," directed at Ms. Gitsham by the Human Resources and Training Director, Wayne Gilbert, as well as a statement to another employee,

---

[13] *Flowers v. Southern Regional Physician Services*, 247 F.3d 299, 235 (5th Cir. 2001).
[14] *Shepherd v. Controller of Public Accounts*, 168 F.3d 871, 873 (5th Cir. 1999), *cert denied*, 428 U.S. 963 (1999).
[15] *Harris v. Forklisft Systems Inc.*, 510 U.S. 17, 23 (1993).
[16] *See Shepherd*, 168 F.3d at 874 (underscoring the severity prong of the hostile work environment analysis).
[17] *See Farpella-Crosby*, 97 F.3d at 806.
[18] *Id.*; *see Harris*, 510 U.S. at 24 ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). *Compare Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (internal citations omitted).

"Ask Tammy if she has her ears on. You know, that's why I could never make love to her. She wouldn't be able to hear me when I whispered in her ear." Further, Bobrich's CEO, Mr. Suarez, made a similar comment about Ms. Gitsham's hearing disability to Ms. Gitsham in front of all of the managers at a Christmas party. Finally, Ms. Gitsham's direct supervisor was apparently indifferent to her two separate complaints, making Bobrich's conduct egregious.[19] A reasonable jury could have concluded, therefore, that the Bobrich managers' conduct was sufficiently severe to alter the terms of her employment and to create a hostile work environment. Accordingly, Defendant's Motion for Judgment as a Matter of Law is **DENIED** as to Plaintiff's hostile work environment claim.

*Whether Bobrich constructively discharged Tammy Gitsham*

Bobrich argues that the evidence introduced at trial was insufficient to sustain the jury's determination that Ms. Gitsham was constructively discharged. To prevail on a claim of constructive discharge, a Plaintiff must establish that "the abusive working environment became so intolerable that her resignation qualified as a fitting response," under the test announced in *Pennsylvania State Police v. Suders*.[20] The following factors, cited in the Fifth Circuit's decision in *Haley v. Alliance Compressor*,[21] inform the constructive discharge analysis: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) badgering, harassment, or humiliation by the employer *calculated to encourage the employee's resignation*, and (6) offers of early retirement. Although Ms. Gitsham is not required

---

[19] Ms. Gitsham's complaints to her direct supervisor, Mr. Schuster, about the daily embarrassing remarks by Mr. Gilbert were not followed by any formal or informal response. Further, Mr. Schuster again took no action after Ms. Gitsham complained of Mr. Suarez's actions.
[20] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004).
[21] 391 F.3d 644 (5th Cir. 2002).

to prove that Bobrich specifically intended that she resign, a claim of "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile work environment claim." [22]

In its Supplemental Brief in Opposition to Defendant's Rule 50(a) Renewed Motion, the EEOC urges review of Ms. Gitsham's constructive discharge claim under the *Suders* test, rather than pursuant to the analysis set forth in *Haley*, for two reasons. First, the EEOC maintains that *Suders* supersedes *Haley's* multi-factor inquiry. Second, the EEOC argues that Defendant waived its right to invoke the *Haley* factors by urging the *Suders* test in its Proposed Jury Instructions and in its Response to EEOC's Trial Brief, and by failing to raise *Haley* in the Contested Issues of Law section of the parties' Joint Pretrial Order. These arguments are unpersuasive.

Plaintiff misreads *Suders* as superseding the *Haley* factors. Two unpublished Fifth Circuit decisions reject Plaintiff's theory. *Easterling v. School Bd. of Concordia Parish* and *Vallecillo v. U.S. Dept. of Housing & Urban Development* both apply the *Haley* factors to the *Suders* "fitting response" inquiry.[23] Defendant's argument for application of *Suders* in pretrial briefs does not foreclose its citation of the *Haley* factors in its Renewed Motion for Judgment as a Matter of Law. Indeed, the tests of *Suders* and *Haley* are not mutually exclusive. The Fifth Circuit has confirmed that *Haley* remains germane.

The jury's constructive discharge determination must be vacated, because the Court concludes that Ms. Gitsham's resignation was not a fitting response to her work conditions, with or without resort to the *Haley* factors. However, since it concludes that the *Haley* factors should be applied to *Suders*' "fitting response" analysis, as did the panels in *Easterling* and *Vallecillo*,

---

[22] *Haley*, 391 F.3d at 650 (quoting *Brown*, 237 F.3d at 566); *see Jurgens*, 903 F.2d at 390.
[23] 196 Fed.Appx. at 253; 155 Fed.Appx. at 768.

this Court looks to *Haley*. Here, the EEOC introduced evidence only of the fifth *Haley* factor – badgering, harassment, or humiliation by the employer allegedly calculated to encourage the employee's resignation. The E.E.O.C. did not allege that Defendant demoted Ms. Gitsham, reduced her salary or job responsibilities, assigned her menial or degrading work under a less experienced supervisor, or offered her early retirement. The Court concludes that as a matter of law, the evidence was insufficient for a jury to find that the badgering was *calculated to encourage* Gitsham's resignation. Plaintiff did not introduce any evidence on the motivations for Mr. Gilbert or Mr. Suarez's conduct. Further, Defendant's promotion of Ms. Gitsham suggested the company's desire to retain her, rather than provoke her resignation. Finally, Plaintiff never argued, and the jury never found, that the two disciplinary actions involving Ms. Gitsham were intended to prompt her departure or were related to her disability.

The evidence introduced at trial was also insufficient to demonstrate that Ms. Gitsham's resignation was a "fitting response" to Defendant's harassment. Ms. Gitsham's awareness, prior to her resignation, of Mr. Gilbert's imminent departure from Bobrich made her response unreasonable. Indeed, Mr. Gilbert, who regularly badgered Ms. Gitsham, was her principal antagonist, and his impending resignation seemed to portend a more hospitable workplace. Indeed, only one other employee, Mr. Suarez, had insultingly referenced Ms. Gitsham's impairment, and he did so only once. Further, Ms. Gitsham did not introduce evidence of a general corporate culture hostile to deaf employees, which might have potentially endured after Mr. Gilbert's resignation. The Court concludes, therefore, that insufficient evidence supported the jury's finding that Ms. Gitsham's resignation was a fitting response to the workplace

conditions. Accordingly, the Court **GRANTS** Defendant's Motion for Judgment as a Matter of Law as to whether Ms. Gitsham was constructively discharged.

*Damages*

The next issue is whether the backpay and punitive damages awarded by the jury were proper. The jury awarded Ms. Gitsham $16,500 in backpay, $50,000 in compensatory damages, and $100,000 in punitive damages.

The Court first considers whether the jury properly awarded Plaintiff backpay. Backpay is only available in a Title VII action when an employee has been constructively discharged.[24] Here, as discussed above, there was insufficient evidence to support the jury's verdict regarding constructive discharge. Accordingly, Defendant's Motion for Judgment as a Matter of Law is **GRANTED** as to the jury's award of backpay.

The next issue is whether the jury's award of punitive damages was proper. In *Kolstad v. American Dental Association*, the Supreme Court clarified the showing required for recovery of punitive damages. Punitive damages are only available when an employer acts with "malice or with reckless indifference to the plaintiff's federally protected rights."[28] An employer's "discrimination in the face of a perceived risk that its actions will violate federal law" will establish the requite recklessness.[29] Egregious conduct may also evidence recklessness or malice.[30] Here, the persistent, public derision of Ms. Gitsham's hearing loss was egregious. Further, a reasonable jury could have concluded that Mr. Gilbert, as Director of Human

---

[24] 903 F.2d at 389.
[25] 527 U.S. 526, 536 (1999).
[26] *Id*.
[27] *Id*.

Resources and Training, was knowledgeable about Title VII's requirements and, therefore, acted "in the face of a perceived risk that [his] actions . . . violate[d] federal law."[1] Therefore, the jury's award of $100,000 in punitive damages was proper.

Finally, Plaintiff's Motion to Withdraw EEOC's Application for Injunctive Relief, including the parties' accompanying Agreement on the scope of injunctive relief, is **GRANTED**.

**SO ORDERED.**

January 8, 2008.

_____
**BARBARA M.G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

---

[29] *Kolstad*, 527 U.S. at 536.